IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

RUFUS PAUL HARRIS,
BENJAMIN STANLEY, and
DARRYL HORTON,

                Defendants.

CRIMINAL CASE NO.

1:09-CR-0406-TCB-JFK

## REPORT AND RECOMMENDATION

Pending before the court are Defendant Rufus Paul Harris' motion [Doc. 69] to dismiss Counts One, Two and Eight of the Indictment as duplicitous and motion [Doc. 68] to suppress statements made in a deposition during civil litigation involving the United States Securities and Exchange Commission; Defendant Benjamin Stanley's motion [Doc. 88] to dismiss Counts One, Two and Eight of the Indictment as duplicitous and motion [Doc. 85] to suppress statements made in a deposition in the same civil litigation; and Defendant Darryl Horton's motion [Doc. 89] to dismiss Counts One, Two and Eight of the Indictment as duplicitous, motion [Doc. 74] to suppress statements made in a deposition in the same civil litigation, and motion [Doc.

75] for severance of Defendants.  After consideration of the briefs of the parties and the relevant legal authority, the court recommends that Defendants' motions to dismiss be denied, that Defendants' motions to suppress statements be denied, and that Defendant Horton's motion for severance be denied.

## I.      Motion for Severance of Defendants

Defendant Horton filed a preliminary motion [Doc. 75] for severance of Defendants pursuant to Fed. R. Crim. P. 14(a).  Due to the conclusory, vague and unsupported allegations asserted in the preliminary motion, Defendant, if he wished to pursue the motion, was directed to file a supplemental brief on or before February 23, 2010.  [Doc. 84].[1] Defendant advised the court that he was not supplementing the

---

[1] In the court's pretrial order, to avoid the filing of frivolous motions for severance which necessitate responses by the Government and the expenditure of court resources, the court specifically advised counsel for Defendant:

M.  Motions to Sever Defendants Under Fed. R. Crim. P. 14(a) Due to Prejudicial Overspill:  Severance under Fed. R. Crim. P. 14 where there is an allegation of undue prejudice from a joint trial due to prejudicial "overspill" is warranted only when a defendant demonstrates that a joint trial will result in "specific and compelling prejudice" to his or her defense.  Compelling prejudice occurs when the jury is unable, even after proper instruction from the trial court, "to separately appraise the evidence as to each defendant and render a fair and impartial verdict."  United States v. Liss, 265 F.3d 1220, 1228 (11th Cir. 2001).  The trial court is empowered to sever defendants or counts after the commencement of the trial under Rule 14 if manifest necessity so

2

motion for severance.  The Government has responded opposing the motion for severance.  [Doc. 92].  The Government's response sets forth abundant grounds for denying the preliminary motion for severance, and based on the legal authority cited therein, the court **RECOMMENDS** that the motion [Doc. 75] for severance of Defendants be **DENIED**.

## II.    Motions to Dismiss

Defendants move [Docs. 69, 88, 89] to dismiss Counts One, Two and Eight of the Indictment on the grounds that the counts are duplicitous.  All three Defendants are named in Counts One and Two of the Indictment; however, only Defendant Harris is named in Count Eight.  [Doc. 1].  The challenged counts allege violations of 18 U.S.C. § 1349, a conspiracy to commit security and wire fraud, in Count One, of 18 U.S.C. § 1348, a scheme to commit security fraud, in Count Two, and of 18 U.S.C. § 1350(c), false certification of a financial statement, in Count Eight.

---

requires.  United States v. Butler, 41 F.3d 1435, 1441 (11th Cir. 1995). Therefore, any motion for severance on grounds of prejudicial overspill should not be filed unless it sets out **specific, individualized grounds** as to why the defendant is unduly prejudiced by a joint trial with others.

[Doc. 52, ¶ M].  Despite this admonition, Defendant's counsel filed a motion for severance that did not comply with the court's order and then failed to either supplement or withdraw the meritless motion.

3

"The error of duplicity is present where more than a single crime is charged in one count of an indictment." United States v. Ramos, 666 F.2d 469, 473 (11th Cir. 1982); see also United States v. Seher, 562 F.3d 1344, 1360 (11th Cir. 2009) ("'A count in an indictment is duplicitous if it charges two or more separate and distinct offenses.'") (quoting United States v. Schlei, 122 F.3d 944, 977 (11th Cir. 1997)). "The policy reasons against duplicitous indictments 'include avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant of adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution.'" United States v. Miller, 26 F. Supp. 2d 415, 423 (N.D. N.Y. 1998) (quoting United States v. Aracri, 968 F.2d 1512, 1518 (2nd Cir. 1992)); see also United States v. Hardy, 762 F. Supp. 1403, 1408 (D. Ha. 1991) (vices of duplicity include violation of defendant's Sixth Amendment rights to notice of charges brought against him and to unanimous jury verdict and of his Fifth Amendment protection against double jeopardy).

Defendants attack the conspiracy charge set forth in Count One of the Indictment brought pursuant to 18 U.S.C. § 1349 as well as the securities fraud charge

4

in Count Two brought pursuant to § 1348, which is also one of the alleged objects of

the conspiracy asserted in Count One.  The focus of the attack on both counts is the

manner by which the Indictment pleads the violation of § 1348.  [Docs. 69, 88, 89].

Defendants contend that because charges in the Indictment allege that their conduct

constituted violations of both subsections of § 1348 within the same charge, the Counts

are duplicitous.  [Id.].

> In Count One, the pertinent part of the allegations against Defendants provides:
>
> [Defendants] . . .  did knowingly and willfully and unlawfully combine, conspire, confederate, agree and have a tacit understanding with each other . . . to commit certain offenses against the United States, to wit: . . . .
> 2.  To knowingly and willfully execute and attempt to execute a scheme to defraud with regard to the publicly-traded securities of Conversion Solutions Holdings Corporation, in violation of Title 18, United States Code, Section 1348. . . .

[Doc. 1, Count One].  And Count Two in pertinent part provides:

> [Defendants] . . . did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud other persons, in connection with stock securities of CSHC, and to obtain, by means of false and fraudulent pretenses, representations, and promises, any money or property in connection with the purchase and sale of stock securities of CSHC. . . .

[Doc. 1, Count Two].  Section 1348, in pertinent part states:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice-

5

(1)  to defraud any person in connection with any commodity for future delivery, or any option on a commodity for future delivery or any security of an issuer with a class of securities . . .; *or*

(2)  to obtain, by means of false or fraudulent pretenses, representations, or promises, any money or property in connection with the purchase or sale of any commodity for future delivery, or any option on a commodity for future delivery or any security of an issuer with a class of securities . . .;

shall be fined under this title, or imprisoned not more than 25 years, or both.

18 U.S.C. § 1348 (emphasis added).

With respect to Count One charging a conspiracy in violation of § 1349, even if the two subsections of § 1348 constitute separate offenses as argued by Defendants, Count One is not duplicitous.  Although an indictment "may not charge multiple conspiracies in a single count[,] . . . [a] single conspiracy [ ] may have multiple objects because the single conspiracy is the crime, not its diverse objects."  Miller, 26 F. Supp. 2d at 423 (citation omitted).  As stated by the Supreme Court in Braverman v. United States, 317 U.S. 49, 63 S. Ct. 99, 87 L. Ed. 23 (1942), "[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for '[t]he conspiracy is the crime, and that is one, however diverse its objects.'"  Id. at 54, 63 S. Ct. at 102 (citation omitted); see also United States v. Diaz, 690 F.2d 1352, 1356 (11th Cir. 1982)

6

("An indictment may charge a conspiracy with more than one distinct substantive offense. . . .").

Defendants misconstrue the conspiracy count. It charges a conspiracy pursuant to § 1349 with the dual objects of the conspiracy, that is, of the agreement, being to violate §§ 1348 and 1343. Such a conspiracy charge is not duplicitous, even if § 1348 in and of itself contains separate offenses. See United States v. Smith, 891 F.2d 703, 713 (9th Cir. 1989) ("[W]here conspiracy is the charge, the established rule is that a charge of conspiracy to commit more than one offense may be included in a single count without violating the general rule against duplicity."); Ramos, 666 F.2d at 473 (the court found totally without merit defendant's claim that dual object drug conspiracy charging a 21 U.S.C. § 846 conspiracy to possess and to distribute a controlled substance was duplicitous).

Additionally, § 1348, as pled in Counts One and Two, does not allege separate crimes in each single count. The Eleventh Circuit Court of Appeals has addressed and resolved, contrary to Defendants' contention, the issue of whether a count in an indictment, based on a penal statute setting forth alternative means for commission of the offense, is duplicitous when that count includes all of the alternative means for violating the statute. In United States v. Burton, 871 F.2d 1566 (11th Cir. 1989),

7

rejecting an attack on an indictment alleging a violation of 18 U.S.C. § 641, the court

stated:

> Where a penal statute, such as 18 U.S.C. § 641, prescribes several
> alternative ways in which the statute may be violated and each is subject
> to the same punishment, however, the indictment may charge any or all
> of the acts conjunctively, in a single count, as constituting the same
> offense, and the government may satisfy its burden by proving that the
> defendant, by committing any one of the acts alleged, violated the statute.
> . . . The conjunctive allegations do not render the indictment duplicitous.

Id. at 1573 (citations omitted); see also United States v. Cornillie, 92 F.3d 1108, 1110

(11th Cir. 1996) (same and adding that the "court's charge to the jury should track the

language of the statute").

Section 1348, which is patterned on 18 U.S.C. §§ 1341, 1343 and 1344, is a

penal statute that proscribes several means by which the statute may be violated.

Rejecting attacks based on duplicity, courts have found that a single count in an

indictment which alleges the alternative means by which the mail fraud, wire fraud or

bank fraud statutes may be violated only states one crime.[2] See, e.g., United States v.

---

[2]For example, § 1344, the bank fraud statute, provides in pertinent part:

Whoever knowingly executes, or attempts to execute, a scheme or
artifice-
(1)  to defraud a financial institution; *or*

(2)  to obtain any of the moneys, funds, credits, assets, securities, or other

Lefebvre, 189 Fed. Appx. 767, 772 (10th Cir. 2006) ("[T]his court has determined that when both a scheme to defraud and to obtain money are charged in one indictment or in a single count and are connected in the conjunctive, they are not duplicitous, and it will suffice to prove any one or more of the charges."); United States v. Caldwell, 302 F.3d 399, 408 (5th Cir. 2002) (citing to a decision upholding a bank fraud conviction which alleged in a single count that the defendant had devised a scheme to defraud and to obtain money and applying the reasoning to a mail fraud count, the court stated "these two allegations were 'alternative ways in which [the] offense c[ould] be committed,' not allegations of multiple violations of § 1344") (citation omitted); United States v. Crisci, 273 F.3d 235, 239 (2nd Cir. 2001) (joining other circuits reaching the same conclusion, the court "held that a single count of an indictment may charge bank fraud under both subsections (1) and (2) and that proof of the violation of either section is sufficient to support a conviction") (citations omitted).  Section 1348 is the fraud statute that addresses securities and allows for the statute to be violated by

---

property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises. . . .

18 U.S.C. § 1344 (emphasis added).

9

a scheme to defraud or to obtain money. Charging a violation of that statute in the conjunctive only alleges a single crime. See United States v. Hatfield, 2009 WL 2182593, at *3 (E.D. N.Y. July 22, 2009) (rejecting the defendant's contention that subsections (1) and (2) of § 1348 constitute separate offenses which cannot be pled in the same count and finding "that the challenged counts set forth different methods of committing one offense").[3]

Accordingly, the court finds that neither Count One nor Count Two of the Indictment is duplicitous. Even if either count was determined to be duplicitous, the remedy is not dismissal of that count of the indictment. Any danger flowing from the duplicity of charging more than one crime in a single count is "cured by a jury instruction explaining unanimous agreement must be reached that the government proved, beyond a reasonable doubt, at least one or the other – i.e., either a scheme to defraud or to obtain money by false pretenses." Lefebvre, 189 Fed. Appx. at 772-73; see also Hatfield, 2009 WL 2182593, at *2 (to address a duplicity issue, "'a jury

_____

[3]The district court likewise rejected the same argument made Defendants herein attacking the conspiracy charge brought pursuant to § 1349. The court stated, "Essentially, Brooks maintains that Count One requires the Government to establish two conspiracies, one in violation of Section 1348(1), and other conspiracy in violation of Section 1348(2). . . . Defendant may violate § 1349 by engaging in acts that violate either § 1348 (1) or (2). The Government has charged that Defendants committed a single conspiracy to violate Section 1348, not two separate conspiracies." Id. at *5.

instruction that ensures that the jury is unanimous as to the conduct underlying the conviction'" is an appropriate safeguard) (citation omitted); <u>United States v. Carter</u>, 2007 WL 230451, at *4 (S.D. Ga. January 24, 2007) (dismissal of duplicitous count is not appropriate remedy because "any concern regarding jury unanimity may be addressed by curative instructions to the jury that its verdict must be unanimous on whatever specification the jurors find to be the predicate of a guilty verdict"); <u>United States v. Campbell</u>, 2005 WL 6436621, at *7 (N.D. Ga. October 24, 2005) ("to the extent the indictment presented any duplicity, the ambiguity could be cured through jury instructions and/or special interrogatories").

Defendant Harris also challenges as duplicitous Count Eight of the Indictment which alleges in pertinent part:

> Defendant . . . falsely certified as CSHC's Chief Executive Officer that CSHC's annual report . . . fairly presented, in all material respects, the financial condition and results of CSHC's operations, and that the report complied with all other requirements of Title 18, United States Code, Section 1350, in that the Defendant knew, contrary to his certification, that the annual report did not comply with those requirements and contained material misstatements about CSHC's assets, income and business, in violation of Title 18, United States Code, Sections 1350(c)(1) and [(2)].

[Doc. 1, Count Eight]. Section 1350 provides in pertinent part:

> (c)    Criminal Penalties.-Whoever-

11

>    (1) certifies any statement as set forth in subsections (a) and (b) of
> this section knowing that the periodic report accompanying the statement
> does not comport with the requirements set forth in this section shall be
> fined not more than $1,000,000 or imprisoned not more than 10 years, or
> both; *or*
>    (2) *willfully* certifies any statement as set forth in subsections (a)
> and (b) of this section knowing that the periodic report accompanying the
> statement does not comport with the requirements set forth in this section
> shall be fined not more than $5,000,000 or imprisoned not more than 20
> years, or both.

18 U.S.C. §§ 1350(c)(1) and (2) (emphasis added).

Defendant, alleging that Count Eight is duplicitous, contends: "It charges Mr. Harris with either violating . . . § 1350(c)(1) or (c)(2), but fails to include the necessary language in the charge to warrant charging (c)(2)." [Doc. 69, ¶ 3]. It is not clear if Defendant is making an argument that the count is simply duplicitous or also fails to state a claim under subsection (c)(2) having omitted the allegation that Defendant's conduct was willful. Assuming Defendant has made both arguments, although the court notes in a very conclusory manner and, as with Defendants' challenge Counts One and Two, absent the citation to any legal authority, the court will address both issues.

First the count is not duplicitous. Arguing that the count does not allege separate crimes but only separate penalties for the same conduct depending on

defendant's mental state, the Government relies on the Eleventh Circuit Court of Appeals' decision in <u>Seher</u>, 562 F.3d 1344, cited *supra*. [Doc. 87 at 5-6]. However, while agreeing with the Government's conclusion, the court finds the statute at issue in <u>Seher</u>, 18 U.S.C. § 1956(a)(3), and the court's analysis of that statute inapposite to the statute at issue herein. In <u>Seher</u>, the court found that § 1956(a)(3)'s three subsections, (A), (B), and (C), did not create separate crimes but that the section created "a single offense of money laundering with alternative mental states, *subject to only one punishment*." 562 F.3d at 1362 (emphasis added); <u>see also</u> <u>United States v. Trevino</u>, 2007 WL 1174852, at *3 (E.D. Mo. April 20, 2007) (discussing § 1956(a)(1), the court noted that the statute made money laundering a crime, "then separately lists each manner of violating the statute and *imposes a single penalty for all of them*, 'a construction which indicates that Congress did not mean to create more than one offense'") (citation omitted; emphasis added). The critical distinction between § 1956(a)(3) and § 1350(c) is that the latter subjects an offender to *different punishments* depending on the mental state alleged and established at trial. <u>See also</u> <u>Burton</u>, 871 F.2d at 1573 (finding that a penal statute does not create different crimes when the alternative means of violating the statute subjects the offender "to the same punishment").

13

Subsections (c)(1) and (c)(2) of § 1350 are properly analyzed as the former being a lesser included offense of the latter.  As the Eleventh Circuit Court of Appeals has stated, "a lesser included offense is an offense such that 'it is impossible to commit the greater without having first committed the lesser.' . . .  Stated differently, if all of the elements of an offense constitute a subset of the elements of another offense, the former offense should be treated as a lesser included of the latter offense."  United States v. Gonzalez, 244 Fed. Appx. 316, 320 (11th Cir. 2007) (citation omitted).  The only difference between subsections (c)(1) and (c)(2), besides the increased penalty for a violation of (c)(2), is the addition of the word *willfully* at the beginning of subsection (c)(2).  18 U.S.C. §§ 1350(c)(1) and (c)(2).  As the Government notes, the difference in the subsections is the mental state required - either a knowing false certification or a willful and knowing false certification.  All other elements of proof are the same.

Inclusion of a lesser included offense in either the same count of the indictment as the greater offense or in another count of the indictment does require dismissal.  Trial of a defendant for both a lesser and greater offense does not violate double jeopardy; however, a judgment of conviction and punishment for both does constitute such a violation.  See United States v. Carpenter, 422 F.3d 738, 747 (8th Cir. 2005); see also United States v. Zacherle, 2008 WL 5000145, at *4 (E.D. Wash. November 20,

14

2008) (noting that while "the government may not punish Defendant" for both lesser and greater included offenses, "the government may include both offenses in the indictment and may continue to prosecute Defendant for both offenses through trial"). Defendant's right against double jeopardy is protected by a proper jury instruction on the lesser included offense and by a jury verdict form setting forth the necessary findings as to Defendant's mental state.  See Turner v. United States, 484 F. Supp. 2d 490, 497 (W.D. Va. 2007); United States v. Greer, 956 F. Supp. 520, 523-24 (D. Vt. 1997).

Defendant Harris also contends that Count Eight of the Indictment does not allege the mental status, that is, that he acted willfully, required for a violation of subsection (c)(2).  [Doc. 69, ¶ 3].  The Eleventh Circuit Court of Appeals recently reiterated the law regarding attacks on the sufficiency of an indictment:  "By now it has become well-established that '[t]he sufficiency of a criminal indictment is determined from its face.'. . .  'For an indictment to be valid, it must contain the elements of the offense intended to be charged, and sufficiently apprise the defendant of what he must be prepared to meet.'"  United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006) (citations omitted).  In this regard "an indictment must be sufficiently specific to inform the defendant of the charge against him and to enable him to plead double

15

jeopardy in any future prosecution for the same offense.  An indictment satisfies these requirements as long as the language therein sets forth the essential elements of the crime."  United States v. Cole, 755 F.2d 748, 759 (11th Cir. 1985); see also United States v. Plummer, 221 F.3d 1298, 1302 (11th Cir. 2000) ("In reviewing a motion to dismiss an indictment we look only at whether the Government has alleged each of the elements of the statute.").  However, "[t]he law does not compel that the indictment track the statutory language."  United States v. Stefan, 784 F.2d 1093, 1101 (11th Cir. 1986).

In Seher, discussed *supra*, the defendant contended that, because the count alleging money laundering did not specify the mental status required for each alternative means of violating the statute, the count failed to include each element of the charged offense.  562 F.3d at 1357.  In rejecting the defendant's contention, the Eleventh Circuit Court of Appeals reviewed circuit precedent on this issue to find that the statutory references in the challenged count, as pled in the case before the court, were sufficient to conclude that the grand jury found probable cause for all of the essential elements of the challenged count.  The court concluded:

> These cases indicate that the Fifth Amendment is satisfied if the indictment makes a specific statutory reference to an essential element of

16

> the offense and contains some other indication from which we can infer
> that the grand jury found that element to be present.

Id. at 1357-58; see also United States v. Brown, 346 Fed. Appx. 481, 490 (11th Cir.

2009) (noting that the indictment defect alleged was omission of an element of the

offense, the court stated that reference to the statutory provision "provided [the

defendant] with adequate notice of the charge against him"); Stefan, 784 F.2d at 1101-

02 ("'Moreover, when the indictment specifically refers to the statute on which the

charge was based, the statutory language may be used to determine whether the

defendant received adequate notice.'") (citation omitted).

Defendant has adequate notice of the elements of § 1350(c)(2) in this case.

Count Eight of the Indictment does not include the word willfully.  [Doc. 1, Count

Eight].  But the count does allege that Defendant's conduct was in violation of 18

U.S.C. § 1350(c)(2), which specifies in pertinent part: "Whoever . . . willfully certifies

any statement. . . ."  That count also incorporates by reference paragraph 2 of Count

One which asserts that as part of one of the objects of the conspiracy Defendant

"knowingly and willfully" executed a scheme to commit securities fraud - which is

related to the certification of the false statement referenced in Count Eight.  [Doc. 1,

Counts One, ¶ 2, and Eight, ¶ 1].  Accordingly, Defendant is on notice of the mental

17

status required to establish a violation of the greater of the two provisions set forth in that count.

For these reasons, the court **RECOMMENDS** that Defendants' motions [Docs. 69, 88, 89] to dismiss Counts One, Two and Eight of the Indictment be **DENIED**.

## III.   Motions to Suppress Statements

Finally, pending before the court are Defendants' motions [Docs. 68, 74, 85] to suppress statements made during each Defendant's deposition in the civil proceeding initiated by the Securities and Exchange Commission ("S.E.C.") against Conversion Solutions Holding Corporation ("CSHC") and Rufus Paul Harris [1:06-CV-2568-CC; Doc. 1].[4] Defendants initially sought to suppress their statements alleging violations of their Fifth Amendment right against self-incrimination and failure to provide Miranda warnings and their Sixth Amendment right to counsel.  [Docs. 68, 74, 85]. As the Government correctly pointed out in the response to the motions to suppress, neither right attaches to the civil depositions at which Defendants made their statements.  [Doc. 86 at 7-9].  The Government further asserted, although not alleged as a ground for relief by Defendants, that Defendants' Fifth Amendment Due Process

_____

[4]In citing to the civil docket, the court will provide the civil case number and docket entry number; however, when citing to the criminal docket in the instant prosecution, the court will only reference the docket entry number.

18

rights were not violated by the use of the deposition testimony and that Defendants were not entitled to a hearing on their motions.  [Id. at 10-16].  In the joint reply by Defendants in support of the motions to suppress, Defendants abandoned the claims asserted in the motions to suppress based on the Fifth Amendment right against self-incrimination and based on the Sixth Amendment right to counsel, relying instead on an alleged violation of their Fifth Amendment Due Process rights to suppress the statements and, in doing so, sought an evidentiary hearing.  [Doc. 93].  Accordingly, the only issue before the court is whether the Government's conduct in taking Defendants' depositions during the civil litigation violated their due process rights such that the Government cannot use the depositions during trial in the criminal prosecution of Defendants.

After consideration of the positions of the Government and Defendants regarding holding an evidentiary hearing, the court granted Defendants' request for a hearing which was held on June 29, 2010.[5]  [Doc. 104].  In the post-hearing briefs in support of the motions to suppress,[6] Defendants contend that the actions of the S.E.C.

---

[5]Citations to the transcript of the hearing are:  (Tr. at ).

[6]The court notes that Defendant Horton's post-hearing briefs indicate that each is offered in support of "motion to dismiss" as well as motion to suppress.  [Docs. 111, 113].  However, no motion to dismiss is pending based on an alleged violation of

19

in securing their statements as part of the civil litigation and providing those statements to the criminal prosecutors handling the instant case, due to the interaction between the agencies and the failure to advise Defendants of the potential use of the statements in a criminal prosecution, require suppression of the statements. [Docs. 109, 110, 111]. The Government opposes the motions to dismiss contending that the S.E.C. and the U.S. Attorney's Office conducted properly authorized parallel investigations and that use of the civil deposition testimony of Defendants in the criminal prosecution does not violate their Fifth Amendment Due Process rights. [Doc. 112]. After consideration of the totality of the circumstances and the briefs of the Government and Defendants, the court finds that Defendants' rights were not violated and that the motions to suppress should be denied.

### a.    Background Facts

In 2006, the S.E.C. began an investigation, overseen by Debbie Hampton, Investigative Staff Attorney, into conduct by CSHC and Paul Harris, CSHC's CEO, believed to be in violation of S.E.C. regulations. (Tr. at 35, 56-57). While conducting the investigation, Ms. Hampton had telephonic contact with Harris, and she invited

---

Defendant's due process rights.

20

Harris to meet with her to discuss the investigative concerns arising out the issuance of press releases concerning the value of CSHC stock.   (Tr. at 35-36, 62). Understanding that Harris intended to meet with her, Ms. Hampton mailed to Harris a Form 1662 with a cover letter.[7] (Tr. at 36-37, 63; Gov't Ex. 3).  However, Harris did not meet with Ms. Hampton during the investigatory phase of the case.  (Tr. at 38).

Ms. Alana Black, Senior Trial Counsel for the S.E.C.,[8] who handled the CSHC matter once in litigation, explained the use of Form 1662 as it relates to a S.E.C. investigation and during litigation of a S.E.C. case in federal court.  (Tr. at 11, 15-22; Gov't Ex. 2).  During the investigation of potential S.E.C. violations, prior to the institution of a civil action, a Form 1662 is provided when information is sought from non-regulated entities and individuals.[9]  The form provides information to the recipient, such as, admonition to be truthful, that any testimony will be transcribed, that the entity or individual may be represented by counsel, warning against perjury, Fifth Amendment right against self-incrimination and that any response is voluntary,

---

[7]Ms. Black could not say whether Harris received the form.  (Tr. at 63-64).

[8]Ms. Black left the S.E.C. in March 2010, when she was hired as an Assistant U.S. Attorney for the Northern District of Georgia.  (Tr. at 71).

[9]In contrast, a Form 1661 is used for regulated entities and individuals who are required to provide requested information to the S.E.C.  (Tr. at 16-17).

21

and outlines the uses of any information provided, including stating that the information may be used to coordinate "law enforcement activities between the SEC and other federal . . . law enforcement agencies. . . ."  (Tr. at 17-22; Gov't Ex. 3).  Ms. Black further explained that after the S.E.C. files civil litigation, all discovery is controlled by the federal rules of civil procedure and that evidence obtained from parties and non-parties is constrained by those rules.[10]  (Tr. at 14-18, 95).

Assistant U.S. Attorney Justin Anand, Criminal Division, Economic and Cyber Crimes Section, testified that a few days before the civil complaint against CSHC was filed by the S.E.C., he and Assistant U.S. Attorney Paul Monin were at the S.E.C. offices on another pending case.  (Tr. at 107-08, 120).  At the conclusion of that meeting, S.E.C. Supervisor Bill Hicks arrived and stated that he thought they should know about a matter the S.E.C. planned on charging in a few days.  (Tr. at 108-09, 120).  Mr. Hicks provided a brief sketch of the evidence, lasting less than half a hour, that would be presented in the papers filed with the court involving CSHC.[11]  (Tr. at

---

[10]Ms. Black testified that S.E.C. regulations restrict the use of the broad S.E.C. investigative powers during civil litigation to prevent abuse of those powers once civil litigation has been initiated.  (Tr. at 14-15).

[11]Mr. Anand recalled the name CSHC, and so advised Mr. Hicks, due to the fact that in early September 2006, he had participated in a meeting at which Maurice Bennett and Sabra Dobbs reported a complaint indicating that CSHC was allegedly the

109, 116, 121).  Mr. Hicks provided, in general terms, the nature of the allegations

against CSHC, that is, the issuance of false press releases regarding the value of the

company's stock, and that the S.E.C. intended to move for a temporary restraining

order ("TRO").  He also advised that the S.E.C. would provide courtesy copies to the

Assistant U.S. Attorneys of the pleadings and motions filed with the court.  (Tr. at 125-

26).  Mr. Anand did not recall any names of individuals being mentioned.[12]  (Tr. at

109-10, 124).  The Assistant U.S. Attorneys did not provide any feedback or make any

comments to Mr. Hicks about the information provided about CSHC nor provide any

advice about what to do in the civil investigation or civil case.  They simply left with

a request to send the courtesy copies.  (Tr. at 115-116, 126, 130).  Sometime after the

meeting, on October 24, 2006, Mr. Anand opened a file in the U.S. Attorney's Office

on CSHC.  (Tr. at 126).  Ms. Black testified that she did not know when Mr. Monin

and Mr. Anand initiated a criminal investigation.  (Tr. at 75-76).

---

victim of a fraud by a contractor.  (Tr. at 122-23).  Mr. Anand did not recall receiving
any information about CSHC from Ms. Hampton prior to the meeting with Mr. Hicks.
(Tr. at 116-17).

[12]Mr. Anand stated that Harris' name might have been mentioned but that neither
Stanley's nor Horton's names were mentioned.  (Tr. at 124).

AO 72A
(Rev.8/82)

Ms. Black began working on the CSHC case a few weeks before October 24, 2006, which was the date the S.E.C. issued a ten-day trading suspension for CSHC stock, filed the civil complaint, and sought a TRO.  (Tr. at 10, 26; Gov't Ex. 4).  Ms. Black explained:

> This case was a little different than some other S.E.C. actions because it was filed to stop an ongoing fraud.  And so the S.E.C. moved quickly by its standards to stop the fraud, and that meant that we didn't have total information about everything that had happened. . . .
>
> And so there were some unanswered questions, more than usual, that needed to be fleshed out in the discovery process.  Another thing that was a little bit different about this case is it was filed at the same time as there was a request for a temporary restraining order and other relief from the court.   And we requested and received the right to do expedited discovery, including short notice depositions, without the normal requirement of waiting for time to pass before initiating those discovery procedures.  So that's why, if you look at number one [that is, the docket in 1:06-CV-2568-CC], you'll see all the documents that were filed with the complaint, and it included - - number two is the motion for the temporary restraining order.  There was a hearing in front of Judge Cooper very early on in the case, just one day after the filing of the complaint.  And as a result of that hearing, or after it, and on the papers Judge Cooper determined to issue the temporary restraining order and to grant us expedited discovery.

(Tr. at 27-28; and see Gov't Ex. 4; 1:06-CV02568-CC, Docs. 1, 2, 5, 6, 7, 13).  Ms. Black believes that she first met Harris at Judge Cooper's courtroom on October 25 or

24

26, 2006, for the hearing on the S.E.C. motions.  He advised her that he wanted to cooperate.  (Tr. at 66-67).

As part of the expedited discovery process, Ms. Black noticed Harris' deposition for October 26, 2006, but due to difficulties with Harris' schedule, the deposition was postponed and held over two days on October 30, 2006, and November 1, 2006.  (Tr. at 28, 38-39; Gov't Ex. 4; 1:06-CV-2568-CC, Docs. 41, 43).  Harris was not represented by counsel at the deposition,[13] and, because the deposition was taken during the civil litigation, a Form 1662 was not provided to him by Ms. Black.  (Tr. at 40-41).  Ms. Black also served a subpoena on non-party Benjamin Stanley for a deposition on October 31, 2006, but when he contacted Ms. Black to request a delay of the deposition to accommodate his attorney, Maurice Bennett, the deposition was reset for November 2, 2006.  (Tr. at 28, 41-42, 97-98).  Ms. Black did not provide a Form 1662 to Stanley or advise him of any other warnings; however, Mr. Bennett was

---

[13]Although not sure when, Ms. Black stated that she discussed with Harris his right to have an attorney and advised him that she was not his attorney.  Harris was not represented by counsel at any time while the S.E.C. civil action was pending.  (Tr. at 64-66).  Nothing in the log that Ms. Black maintained of contacts with Harris and nothing in Harris' deposition transcripts reflects that this conversation occurred prior to or at Harris' deposition.  (Tr. at 65-66).

present during the deposition.[14]  (Tr. at 43, 97; Gov't Ex. 4; 1:06-CV-2568-CC, Doc.

40).  At the time of Stanley's deposition, Ms. Black stated that she had no reason to

believe he was the target of any criminal investigation.  (Tr. at 102).  The questions

that Ms. Black asked Stanley about his family and CSHC stock, which she also asked

Harris and Horton, were based on her attempts to find out where the company funds

were transferred and where the stock was sold, and all of the questions related to her

work on the S.E.C. civil case.  (Tr. at 102-03).

     During this period of time, Ms. Black and Ms. Hampton had contact with Mr.

Monin and Mr. Anand.  With respect to interaction between the S.E.C. and law

enforcement agencies, Ms. Black explained the procedure for the sharing of

information, or conducting parallel investigations, as set forth in the S.E.C. guidelines

and in her practice.  (Tr. at 23-25; Gov't Ex. 2).  After an access request has been made

and granted, "substantive sharing of information [may] take place."  (Tr. at 24).

However, Ms. Black stated that while it is "good to cooperate with others, everything

we did was directed toward the S.E.C.'s own mission and success. . . ."  (Tr. at 24).

She could not agree to do something or not do something because another agency

---

[14]At least two other individuals were deposed during the expedited discovery

process.  (Tr. at 28; Gov't Ex. 4; 1:06-CV-2568-CC, Doc. 45).

AO 72A
(Rev.8/82)

made a request.  (Tr. at 24).  And she stated that the guidelines stressed never concealing or misrepresenting the fact of the risk that information provided to the S.E.C. could be shared with prosecuting agencies, that is, "if someone asks if there is a criminal action pending," unless asked not to disclose by the law enforcement agency, "then it would always be disclosed even if the person doesn't know about it." Otherwise, if asked about any criminal investigation, "then the S.E.C. staff would always say we can't confirm or deny that existence and you should check with the prosecutor or the prosecuting agency."  (Tr. at 25, 99).  Ms. Black stated that "typically" she "would go beyond the suggested treatment in this guidance and [she] would tell people you should operate under the assumption that there is a parallel criminal investigation, because [she] was not in a position to guarantee that there was not."[15]  (Tr. at 25, 99-100).

In this particular S.E.C. civil litigation, the U.S. Attorney's Office sent an access request dated December 1, 2006, to Ronald Crawford at the S.E.C., attention Ms. Black, requesting release of information "In the Matter of Conversion Solutions

---

[15]Ms. Black explained her reasoning was based on her concern that even if a referral to one prosecutor had been declined, she could not be sure that another prosecutor might not be looking at the same conduct; therefore, she "would never say there is no investigation on the criminal side because I would not ever be in a position to know that."  (Tr. at 25).

Holding Corporation." (Tr. at 52, 110; Gov't Ex. 6). On December 8, 2006, the S.E.C. granted the request in the matter of CSHC. (Tr. at 52, 111). Prior to the granting of the access request, there were conversations between Mr. Monin or Mr. Anand and Ms. Black or Ms. Hampton.[16]   Ms. Black stated that there were no "substantive" conversations with Mr. Monin and Mr. Anand before the access request was granted. Although he provides no dates or time frame for the conversations, except to state that some conversations occurred before December1, 2006, Mr. Anand recalls that Ms. Black or Ms. Hampton provided him a summary of the TRO hearing and of testimony that was taken at depositions and, because he asked to be informed, provided a schedule for discovery and depositions. (Tr. at 50-52, 128-30, 132). Ms. Black stated, and Mr. Anand's recollection is not to the contrary, that no documents were provided

---

[16]Ms. Black's recollection of these conversations is based on her review of the call log she started on October 26, 2006, and maintained during the civil litigation. (Tr. at 30-33, 49-50). A redacted version of the log, referencing contacts involving Defendants Harris, Horton or Stanley or their counsel or the U.S. Attorney's Office was relied on by Ms. Black at the hearing. (Tr. at 30-33; Gov't Ex. 5). For example, Ms. Black, when asked about contacts with Mr. Monin and Mr. Anand, referred to the call log which indicated a call from Mr. Monin on November 27, 2006, and from Mr. Anand on December 1, 2006. When asked if she had contacts before November 27, 2006, Ms. Black responded that she did not "have any record" of discussions. (Tr. at 49-50). Given the apparent lack of independent recall of conversations with the U.S. Attorney's Office (Tr. at 83-84), if Mr. Anand's recollection differs from Ms. Black concerning contacts between the offices, the court will rely on Mr. Anand's testimony.

AO 72A
(Rev.8/82)

to the U.S. Attorney's Office prior to the access request being granted, and the only documents provided after December 8, 2006, were records that the S.E.C. had obtained in the civil case.  None of the documents were records that the U.S. Attorney's Office had asked the S.E.C. to obtain for them.  (Tr. at 52, 114).

Ms. Black testified that no one asked her to ask any witness, including Defendants Harris, Horton and Stanley, any particular questions or to obtain any responses from the witnesses.  (Tr. at 53-54).  Ms. Black did not believe that she had contact with the U.S. Attorney's Office prior to either Harris' or Stanley's depositions. (Tr. at 53).  Nothing in Mr. Anand's testimony conflicts with that statement.  Mr. Anand testified that he never suggested or requested that the S.E.C. depose anyone or that certain questions be asked at any deposition.  (Tr. at 111-12).  Mr. Anand was aware that several individuals were deposed who were not charged criminally and some were never targets.  (Tr. at 113).  Mr. Anand also never asked Ms. Black not to disclose the possibility of a criminal investigation or the existence of the investigation and stated that, in fact, in December 2006, attempts had been made to serve grand jury subpoenas on the company.  (Tr. at 112).

In January 2009, in Detroit, Ms. Black, after serving subpoenas, took the depositions of two individuals, non-parties, involved with the financial operations of

CSHC, Darryl Horton, CFO, and Thomas Benson, an independent auditor for CSHC.[17]

(Tr. at 28-29, 44-45, 76).   Horton was deposed on January 9, 2007, and was

represented by counsel, Iris Lender, at the deposition.[18]  (Tr. at 45-46, 73, 75; Gov't

Ex. 4; 1:06-CV-2568-CC, Doc. 42).  Horton was not provided with a Form 1662 at that

time.[19]  (Tr. at 73, 76).  Ms. Black did not recall advising Horton during the deposition

that information he provided could be used in criminal prosecution.  (Tr. at 82, 87).

She testified that even though she was aware of the access request at the time of

Horton's deposition, that fact did not indicate to her that he would be criminally

prosecuted because referrals only resulted in criminal prosecutions in about half of the

---

[17]Some of the delay in scheduling these depositions was due to the fact that the deponents were located out of state, and Ms. Black needed time to review subpoenaed financial documents to prepare for the depositions.  (Tr. at 29, 44).

[18]Ms. Black stated that no one in the U.S. Attorney's Office asked her to depose Horton but that she "noticed Mr. Horton's deposition as part of my own work. . . ." (Tr. at 53).  She did not recall having any specific conversations with Mr. Anand, whom she mainly dealt with, about Horton prior to the deposition.  (Tr. at 86). Nothing in Mr. Anand's testimony contradicts Ms. Black's recollection.

[19]After the conclusion of the civil litigation, in December 2008, when considering filing an administrative action against Horton, Ms. Black provided Horton with an opportunity to make a "Wells submission" to explain why the administrative action should not be instituted and, due to the fact that the civil litigation was no longer pending, provided Horton, via his counsel, Ms. Lender, a Form 1662.  (Tr. at 77-82). Horton did not provide any response to the December 2008 communication from Ms. Black.  (Tr. at 90).

cases.  (Tr. at 87).  At this time, Ms. Black did not know if Horton was a target of any criminal investigation.  (Tr. at 75-76).

Ms. Black stated that this referral "matter appeared to languish for a while" in the U.S. Attorney's Office because, after providing some transcripts of the early depositions when the access was granted, she did not have detailed conversations with the Assistant U.S. Attorneys until mid-2007.  (Tr. at 88-89).  She did not learn that the U.S. Attorney's Office intended to prosecute CSHC and Defendants Harris, Stanley and Horton until more than a year after Horton's deposition.  (Tr. at 87).

The civil litigation was not resolved until September 17, 2008, when following a hearing to establish the amount of civil penalties, a final judgment was entered by Judge Cooper in favor of the S.E.C. against CSHC in the amount of $250,000 and against Harris in the amount of $1,170,000.  (Tr. at 29-30; Gov't Ex. 4; 1:06-CV-2568-CC, Doc. 47).[20]  Defendants were indicted in the instant case on September 15, 2009. [Doc. 1].

---

[20]The court notes that in connection with the hearing on civil penalties, the depositions of Defendants Harris, Stanley and Horton, as well as other witnesses, apparently were introduced by the S.E.C.  (Gov't Ex. 4; 1:06-CV-2568-CC, Docs. 39, 40, 41, 42, 43, 44, 45).

31

Additional facts will be set as necessary in the discussion of Defendants'
motions to suppress.

**b.    Discussion**

Defendants contend that their Fifth Amendment Due Process rights were
violated by the taking of their depositions during the parallel civil litigation and
criminal investigation.  [Docs. 109, 110, 111, 113].  Defendants contend that the
S.E.C.'s civil litigation improperly merged with the U.S. Attorney's Office criminal
investigation as evidenced by the interaction between the offices such that the
government's conduct in this case "departed from the proper administration of criminal
justice in procuring the Defendant[s'] deposition testimony[,]" United States v.
Scrushy, 366 F. Supp. 2d 1134, 1137 (N.D. Ala. 2005).  [Id.].  Defendant Harris also
contends that the failure to advise him of the fact of the criminal investigation, when
the S.E.C. attorney Ms. Black was aware of that investigation, and the fact he was not
advised of the right to have counsel at the deposition further establishes that his due
process rights were violated by the improperly merged civil litigation and criminal
investigation.  [Doc. 109].  Defendant Stanley contends that the "timing" of the filing
of the S.E.C. civil action was the result of intentional efforts to avoid advising him of
his rights as outlined in the Form 1662 and that the failure to advise Defendant of the

pending criminal investigation, given the merged civil litigation and criminal investigation, violated his due process rights.  Defendant finally contends that the Government should have "mitigated" the potential damage to his right against self-incrimination by seeking a stay of the civil proceeding.  [Doc. 110].  Defendant Horton makes many of the same arguments as Defendant Stanley, contending the civil litigation and criminal investigation improperly merged, that the "timing" of the civil litigation was intentional to avoid providing him with a Form 1662, that he was not warned about the pending criminal investigation, and that the S.E.C. should have sought a stay.  [Docs. 111, 113].  None of Defendants' arguments have merit, nor are they supported by the evidence found credible by the court.

As recently summarized by the Fifth Circuit Court of Appeals:

"There is no general federal constitutional, statutory, or common law rule barring the simultaneous prosecution of separate civil and criminal actions by different federal agencies against the same defendant involving the same transactions.  Parallel civil and criminal proceedings instituted by different federal agencies are not uncommon occurrences because of the overlapping nature of federal civil and penal laws.  The simultaneous prosecution of civil and criminal actions is generally unobjectionable because the federal government is entitled to vindicate the different interests promoted by different regulatory provisions even though it attempts to vindicate several interests simultaneously in different forums."

33

United States v. Simcho, 326 Fed. Appx. 791, 792 (5th Cir. 2009) (quoting F.D.I.C. v. Maxxam, Inc., 523 F.3d 566, 592 (5th Cir. 2008)).   In fact, with respect to the investigation and prosecution of potential violations of S.E.C. regulations and laws, parallel civil and criminal investigations and prosecutions are not only common, but the sharing of information between agencies is authorized by statute.   See United States v. Stringer, III, 535 F.3d 929, 933 (9th Cir. 2008) ("Federal securities laws authorize the SEC to transmit evidence it has gathered to the USAO to facilitate a criminal investigation by the USAO. See 15 U.S.C. §§ 77t(b), 78u(d)."); S.E.C. v. Horowitz & Ullman, P.C., 1982 WL 1576, at *6 (N.D. Ga. March 4, 1982) ("the court notes that there is express statutory and regulatory authority for and a history of cooperation between the SEC and the Justice Department").

And the U.S. Supreme Court has recognized and approved the use of parallel civil and criminal investigations and prosecutions as necessary to protect the public interest.  See United States v. Kordel, 397 U.S. 1, 11, 90 S. Ct. 763, 769, 25 L. Ed. 2d 1 (1970).  In Kordel, the Supreme Court held that, on the record before the court, the defendants did not establish "either a violation of due process or a departure from proper standards in the administration of justice" by the use of testimony taken in a civil proceeding against the defendant in the subsequent criminal prosecution. Id. The

34

circumstances noted by the Supreme Court in <u>Kordel</u> which may establish a due process violation but were not present, included: "the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution; nor with a case where the defendant is without counsel or reasonably fears prejudice from adverse pretrial publicity or other unfair injury; nor with any other special circumstances that might suggest the unconstitutionality or even the impropriety of this criminal prosecution." <u>Id.</u> at 11-12, 90 S. Ct. at 769-70.

While these factors provide some guidance for courts considering the issue of whether a defendant's due process rights have been violated, this court agrees with the District Court in <u>Scrushy</u> that the "determining principle" for deciding whether Defendants Harris', Stanley's and Horton's deposition testimony should be suppressed is: "'the prosecution may use evidence acquired in a civil action in a subsequent criminal proceeding *unless* the defendant demonstrates that such use would violate his constitutional rights ***or depart from the proper administration of criminal justice.***'" 366 F. Supp. 2d at 1138 (quoting <u>United States v. Teyibo</u>, 877 F. Supp. 846, 855 (S.D. N.Y. 1995)) (emphasis in original).  And the court finds that the critical evidence that Defendants must establish in order to make the necessary showing of a due process

35

violation, that is, a departure from the proper administration of justice, is either that "the government made affirmative misrepresentations or conducted a civil investigation solely for the purposes of advancing a criminal case." <u>Stringer</u>, 535 F.3d at 937 (noting that courts have "occasionally" either suppressed evidence or dismissed indictments when one of these two factors is present).[21]   Defendants' have not produced this evidence – nor for that matter – produced any other evidence of bad faith by the Government.  <u>See id.</u> at 936 ("The Supreme Court has held that the government may conduct parallel civil and criminal investigations without violating the due process clause, so long as it does not act in bad faith.").

Herein, the civil S.E.C. litigation was not pursued "solely" for the purpose of obtaining evidence for a criminal investigation nor were the depositions of Defendants conducted for the purpose of obtaining evidence for a criminal prosecution.  The undisputed facts support the court's conclusion.  First, the S.E.C. investigation commenced before the U.S. Attorney's Office's file was opened.  (Tr. at 108-09, 120).  In fact, the S.E.C. had decided to file the civil complaint and seek a TRO before even

---

[21]The court has not found, nor have Defendants cited to, any decision suppressing evidence obtained in a civil investigation or proceeding or dismissing an indictment absent evidence of *either* improper motive in bringing or conducting the civil investigation or proceeding *or* affirmative misrepresentation during the course of the civil investigation or proceeding.

AO 72A
(Rev.8/82)

speaking with the Assistant U.S. Attorneys just a few days before the civil litigation was commenced on October 24, 2006. (Tr. at 109, 115-16, 120-21, 124-25). See Stringer, 535 F.3d at 939 ("It is significant to our analysis that the SEC began its civil investigation first and brought in the U.S. Attorney later. This tends to negate any likelihood that the government began the civil investigation in bad faith, as, for example, in order to obtain evidence for a criminal prosecution."). The Assistant U.S. Attorneys, when informed of the pending filing of the complaint and TRO, offered no response or comment or advice to the S.E.C. attorneys. (Tr. at 115, 126). Second, the S.E.C. proceeding was undertaken for a legitimate reason, to stop the ongoing fraud the S.E.C. believed CSHC was engaged in at the time, and District Judge Clarence Cooper, to whom the civil proceeding was assigned, obviously agreed that prompt action was necessary as he not only granted the TRO but granted the S.E.C.'s request to conduct expedited discovery to address the concerns raised in the litigation. (Tr. at 26-28; Gov't Ex. 4; 1:06-CV-2568-CC, Docs. 1, 2, 4, 5, 7, 8).

And, third, the expedited discovery conducted, including the depositions of Defendants Harris, Stanley and Horton, was undertaken in furtherance of the S.E.C.'s civil litigation without any influence by the U.S. Attorney's Office. Ms. Black testified that she did not recall speaking with Mr. Monin or Mr. Anand about Harris

or Stanley prior to their depositions and that she was not requested to ask or not to ask questions of either Defendant by the Assistant U.S. Attorneys. (Tr. at 28-29, 44-45, 49-54, 102-03). Mr. Anand's testimony is not to the contrary. He stated that discussions with Ms. Black or Ms. Hampton, some occurring before December 1, 2006, involved being provided with a summary of hearing or deposition testimony – indicating that he received information after the fact of these events. (Tr. at 111, 129-30, 132). He also confirmed that he did not request that anyone be deposed or that any inquiries be made on behalf of a criminal investigation. (Tr. at 111-12, 114). Likewise, Ms. Black did not recall any discussions about Horton before his January 2007 deposition and again stated that she took the deposition and asked questions at the deposition in furtherance of the S.E.C. civil proceeding. (Tr. at 83-84, 86). No one asked her to take the deposition or to pose questions to Horton. (Tr. at 53-54). Mr. Anand's testimony, as referenced above, does not contradict Ms. Black's recollection. And the use of the depositions at the civil penalties hearing before Judge Cooper in September 2008 corroborate Ms. Black's assertion that the depositions were undertaken to further the S.E.C.'s litigation. (Gov't Ex. 4; 1:06-CV-2568-CC, Docs. 39, 40, 41, 42).

Fourth, the successful outcome of the litigation after two years of pursuing civil relief, that is, the award of $250,000 in civil penalties against CSHC and $1,170,000 against Harris, further establishes, in the court's opinion, conclusively, that the S.E.C. litigation was not undertaken, even in part, much less solely, to obtain evidence for a criminal investigation. (Tr. at 29-30; Gov't Ex. 4; 1:06-CV-2568-CC, Doc. 47). See Teyibo, 877 F. Supp. at 856 (the facts that the S.E.C. began its investigation first, continued to pursue the civil action for two years with a successful outcome, pursuing the potential S.E.C. violations without consulting with the U.S. Attorney's Office in any substantive way indicates that the defendant's due process rights were not violated).

The interaction between the S.E.C. and the U.S. Attorney's Office evidenced by the record in this case does not require a different result. Defendants' claim that the fact the S.E.C. passed on information to the U.S. Attorney's Office (which is all that this record substantiates) demonstrates that the S.E.C. litigation and the criminal investigation merged misunderstands the type of interaction required for the court to find a due process violation. Here, Mr. Hicks advised Mr. Monin and Mr. Anand of the fact of the soon to be filed civil complaint and TRO, offering to provide copies of public record documents. (Tr. at 108-09, 111, 115-16, 120-21, 124-26). Ms. Hampton

39

and Ms. Black advised the Assistant U.S. Attorneys of the schedule of pending discovery or of information already acquired during the civil litigation, such as, the events at the TRO, or during discovery, such as, a summary of deposition testimony. (Tr. at 111, 128-30, 132).  As noted, the S.E.C. regulations contemplate, and courts have universally approved, the passing of information – particularly from the S.E.C. to the criminal investigative agency.  See Stringer, 535 F.3d at 939 ("In this case the SEC's civil investigation was opened first, led to SEC sanctions and was conducted pursuant to the SEC's own civil enforcement jurisdiction. . . .  Congress has expressly authorized the SEC to share information with the Department of Justice to facilitate the investigation and prosecution of crimes.").  There is no evidence before this court that the Assistant U.S. Attorneys, during this early stage of the civil litigation, even discussed the potential criminal investigation with Ms. Black much less offered her advice or directed her actions.  These facts also distinguish the instant case from the facts in Scrushy which led to suppression of the evidence obtained in the civil proceeding.

In Scrushy, the court found that the "civil action and criminal investigation improperly merged on March 12, 2003, when the U.S. Attorney's office *called* the S.E.C. office, *gave* the S.E.C. advice or 'preferences' regarding the content of the

40

deposition and its location, and *recruited* Neil Seiden [a S.E.C. attorney] to participate in the interviews of Bill Owens and Weston Smith in the criminal investigation." 366 F. Supp. 2d at 1137 (emphasis added). The court found that the Government had not only notice of the S.E.C. investigation but "direct input" including providing the S.E.C. attorney with "explicit directions from the U.S. Attorney's office concerning tailoring his examination of Mr. Scrushy." Id. at 1138. The court was especially concerned by the fact that, at the U.S. Attorney's office request, the location of the deposition was relocated from Atlanta to Birmingham to allow for venue over any perjury charges. Id. The facts in the case before this court do not even approach the type of interference or combination of the civil and criminal investigations as established by the facts set forth in Scrushy.[22]

The facts before this court also do not establish any affirmative misrepresentation, trickery or deceit by the S.E.C. in conducting civil discovery during the civil litigation. The only fact that Defendants point to is Ms. Black's failure to warn Defendants that information provided in the depositions may be related to

---

[22]The court in Scrushy distinguished the Teyibo court's finding of no due process violation making note of these factual distinctions, that is, no advice from the U.S. Attorney's Office and the failure to disclose information about the criminal case. 366 F. Supp. 2d at 1138 n.5.

41

criminal investigators and prosecutors and that there was a potential criminal investigation. This is insufficient to carry Defendants' burden. In <u>Stringer</u>, the Ninth Circuit Court of Appeals stated:

> A government official must not "affirmatively mislead" the subject of a parallel civil and criminal investigations "into believing that the investigation is exclusively civil in nature and will not lead to criminal charges." . . . However, "we have consistently held that the failure of an IRS agent . . . to warn a taxpayer that an audit may have potential criminal ramifications does not render the search unreasonable." . . . Other circuits have agreed that Fourth Amendment and possible due process limitations may be implicated in a dual investigation. . . . Almost every other circuit has denied suppression, even when the government agents did not disclose the possibility or existence of a criminal investigation, so long as they made no affirmative misrepresentations.

535 F.3d at 940 (citing, among other cases, <u>United States v. Wuagneux</u>, 683 F.2d 1343, 1347 (11th Cir. 1982)); <u>see also</u> <u>United States v. Posada Carriles</u>, 541 F.3d 344, 355-56 (5th Cir. 2008) (citing cases, including <u>United States v. Tweel</u>, 550 F.2d 297 (5th Cir. 1977), affirming in parallel investigations "that a government official may not make 'material misrepresentations' about the nature of the investigation or inquiry," but showing "that the burden is on the subject of the investigation to prove that such misrepresentations were made," and demonstrating "that we have consistently adhered to the rule, discussed in <u>Tweel</u>, that the 'mere failure' of a government official to warn

42

that an investigation may result in criminal charges does not constitute fraud, deceit, or trickery") (citations omitted).[23]

In support of this claim, Defendants Stanley and Horton point to Ms. Black's alleged failure to follow her own practice of notifying individuals of the potential use of information in criminal investigations and of the "timing" of the civil law suit which Defendants attempt to portray as undertaken to subvert Defendants' receipt of a Form 1662.  [Doc. 110 at 6-9, 14-17; Doc. 111 at 4-8, 17-20; Doc. 113].  The evidence

---

[23]In <u>Tweel</u>, the revenue agent began and conducted the civil tax audit at the specific request of criminal investigators.  <u>Tweel</u>, 550 F.2d at 298.  The defendant's representative specifically asked the revenue agent if a special agent was involved in the audit, and the revenue agent responded in the negative leading the defendant's representative to believe the agent was conducting a routine civil tax audit.  <u>Id.</u> Thereafter, the representative supplied documents in response to the revenue agent's requests.  <u>Id.</u>  Based on these facts, the Court held "that the agent's failure to apprise the appellant of the obvious criminal nature of this investigation was a sneaky deliberate deception by the agent . . . and a flagrant disregard for [the defendant's] rights."  <u>Id.</u> at 299.  The facts in <u>Tweel</u> are inapposite to those before this court, that is, the S.E.C. litigation was not instituted at the request of the U.S. Attorney's Office, there is no evidence that Ms. Black was ever asked if a criminal investigation was pending or possible or that Ms. Black misrepresented the possibility of such an investigation, or otherwise in engaged in deception or trickery.  Likewise, the facts in <u>Scrushy</u>, which led the court to reject the Government's contention there was no showing "of any bad faith because it did not outright lie to" the defendant, are inapposite to those before this court.  366 F. Supp. 2d at 1140.  In deciding that "[t]he court cannot take such a limited view of bad faith[,]" the court again cited to the direct involvement by the U.S. Attorney's Office in conducting the S.E.C. investigation and by the S.E.C. attorney's direct involvement in the criminal case.  <u>Id.</u>

43

presented to the court does not support a finding of bad faith by the S.E.C. in filing the civil action or in conducting discovery.  Defendants misstate Ms. Black's testimony concerning the guidelines for advising individuals about parallel criminal investigations and her practice.  She testified that S.E.C. guidelines stressed never concealing or misrepresenting the fact of the risk that information provided to the S.E.C. could be shared with prosecuting agencies, that is, "*if someone asks* if there is a criminal action pending," unless asked not to disclose by the law enforcement agency, "then it would always be disclosed even if the person doesn't know about it." (Tr. at 25) (emphasis added).  Otherwise, if asked about any criminal investigation, "then the S.E.C. staff would always say we can't confirm or deny that existence and you should check with the prosecutor or the prosecuting agency." (Tr. at 25, 99).  Ms. Black stated that "typically" she "would go beyond the suggested treatment *in this guidance* and [she] would tell people you should operate under the assumption that there is a parallel criminal investigation, because [she] was not in a position to guarantee that there was not." (Tr. at 25, 99-100) (emphasis added).  As the *guidance* that Ms. Black was referring to involved how *to respond to inquiries* about possible related investigations when asked, her response *is limited* to how she typically responds to such an inquiry and not, as suggested by Defendants' arguments, a

44

spontaneous warning issued by Ms. Black to individuals providing information during civil discovery.

As important, Defendants assume, without any facts to support the assumption, that at the time of Defendants Stanley's and Horton's (and Defendant Harris for that matter) depositions, Ms. Black knew that there was a pending criminal investigation by the U.S. Attorney's Office with these men as targets such that when the depositions were conducted she hid that fact. Although Mr. Anand opened a file in the U.S. Attorney's Office on October 24, 2006, there is no evidence before the court that he or anyone else in the U.S. Attorney's Office advised Ms. Black of that fact. (Tr. at 115, 125-27). Ms. Black stated that she did not know when Mr. Monin and Mr. Anand initiated a criminal investigation. (Tr. at 75-76). She did not recall even having contact with the U.S. Attorney's Office prior to either Harris' or Stanley's depositions. (Tr. at 53). And the mere existence of the December 1, 2006, request for access to information obtained by the S.E.C., of which Ms. Black was aware before Defendant Horton's January 2007 deposition, does not support a contrary finding. That access request only identified CSHC as the matter about which the U.S. Attorney's Office sought and received information. None of Defendants' names were on the request. (Tr. at 52, 110-11; Gov't Exs. 6 and 7). Ms. Black testified that even though she was

aware of the access request at the time of Horton's deposition, that fact did not indicate to her that he would be criminally prosecuted because referrals only resulted in criminal prosecutions in about half of the cases. (Tr. at 87). During the relevant time frame, Ms. Black did not know if Horton was a target of any criminal investigation. (Tr. at 75-76). Additionally, the U.S. Attorney's Office did not request that the S.E.C. keep the fact of a potential criminal investigation secret.[24] (Tr. at 112).

And, contrary to Defendants' rank speculation, the evidence does not support a finding that the S.E.C. litigation was timed to avoid providing Defendants with a Form 1662 such as they would have received during the investigation of potential S.E.C. violations. Ms. Black provided an undisputed explanation for the filing of the civil complaint:

> This case was a little different than some other S.E.C. actions because it was filed to stop an ongoing fraud. And so the S.E.C. moved quickly by its standards to stop the fraud, and that meant that we didn't have total information about everything that had happened. . . .

---

[24]Ms. Black also testified that this referral "matter appeared to languish for a while" in the U.S. Attorney's Office because, after providing some transcripts of the early depositions when the access was granted, she did not have detailed conversations with the Assistant U.S. Attorneys until mid-2007. (Tr. at 88-89). She did not learn that the U.S. Attorney's Office intended to prosecute CSHC and Defendants Harris, Stanley and Horton until more than a year after Horton's deposition. (Tr. at 87).

And so there were some unanswered questions, more than usual, that needed to be fleshed out in the discovery process. Another thing that was a little bit different about this case is it was filed at the same time as there was a request for a temporary restraining order and other relief from the court. And we requested and received the right to do expedited discovery, including short notice depositions, without the normal requirement of waiting for time to pass before initiating those discovery procedures. So that's why, if you look at number one [that is, the docket in 1:06-CV-2568-CC], you'll see all the documents that were filed with the complaint, and it included - - number two is the motion for the temporary restraining order. There was a hearing in front of Judge Cooper very early on in the case, just one day after the filing of the complaint. And as a result of that hearing, or after it, and on the papers Judge Cooper determined to issue the temporary restraining order and to grant us expedited discovery.

(Tr. at 27-28; and see Gov't Ex. 4; 1:06-CV02568-CC, Docs. 1, 2, 5, 6, 7, 13). The fact that Judge Cooper granted the S.E.C.'s request for a TRO and for expedited discovery indicates that Ms. Black's stated reason for the timing of the civil complaint had merit and was not undertaken in bad faith. There was a legitimate need for acting quickly to halt the alleged fraud by CSHC. And nothing in the record remotely supports any conclusion that the S.E.C. acted to foreclose providing a Form 1662 to Defendants. In fact, whether or not Harris received the Form 1662 sent by Ms. Hampton during the investigative phase, the S.E.C. was obviously willing to provide the proper forms when required. (Tr. at 35-38, 62-64).

47

Finally, Defendants Stanley and Horton contend that the "Government failed to mitigate any damage that could have resulted by a parallel proceeding simply by obtaining a stay of civil proceedings."   [Doc. 110 at 19-20; Doc. 111 at 20-21]. Defendants, however, point to no legal authority that places such a burden on the Government.  [Id.].  And, given the status of the proceedings, even if a stay was sought by either the Government or Defendants, the district court quite likely would have denied the request.

The District Court for the Southern District of Texas, in Alcala v. Texas Webb County, 625 F. Supp. 2d 391 (S.D. Tex. 2009), discussed the legal framework for deciding whether to grant a stay of a civil action pending a parallel criminal prosecution.  After noting that parallel civil and criminal prosecutions, especially in the securities field, are not uncommon and that the Supreme Court has found that such parallel prosecutions, even when proceeding simultaneously, are not generally prohibited by the constitution, by statute or common law, the court stated that the grant of a stay "is not a matter of constitutional right, but, rather, one of court discretion." Id. at 396; see also U.S. Commodity Futures Trading Commission v. A.S. Templeton Group, Inc., 297 F. Supp. 2d 531, 534 (E.D. N.Y. 2003) (same).  Acknowledging that a primary goal of granting such a stay is the protection of the "Fifth Amendment right

48

against self-incrimination and to resolve the conflict . . . between asserting this right and defending the civil action[,]" the court stated, "Regardless, [i]t is the rule, rather than the exception that civil and criminal cases proceed together." <u>Alcala</u>, 625 F. Supp. 2d at 397 (citations and internal quotations omitted).  The court noted that "the complete stay of a pending civil action until the conclusion of a related criminal proceeding is considered to be an 'extraordinary remedy[,]'" and that "[o]ne reason for this is that a complete stay is tantamount to a defendant's 'blanket assertion' of the Fifth Amendment, which is itself improper." <u>Id.</u> (citations omitted); <u>see also</u> <u>S.E.C. v. Incendy</u>, 936 F. Supp. 952, 957 (S.D. Fla. 1996) (finding that a defendant's attempt to stay proceedings was "akin to a 'blanket assertion' of his Fifth Amendment privilege[,]" which is insufficient because a defendant is required to "present himself with his records for questioning, and as to each question and each record elect to raise or not to raise the defense[,]" thus allowing a court to rule on the validity of the privilege).

Although courts look to a number of factors to determine if "special circumstances" have been presented to warrant a stay of civil proceedings, <u>see</u> <u>Alcala</u>, 625 F. Supp. 2d at 398; <u>A.S. Templeton Group</u>, 297 F. Supp. 2d at 535, the potential overlap between the parallel proceedings "can be particularly important to a

49

defendant's interests[,]" especially the interest raised by Defendants herein, that is, the right against self-incrimination, <u>Alcala</u>, 625 F. Supp. 2d at 400.  In considering this factor, courts have looked to the status of the criminal case, and "[a]nalysis centers upon whether the criminal case is pre-indictment in the investigation stage or post-indictment with a set trial date." <u>Alcala</u>, 625 F. Supp. 2d at 401.  As the District Court in <u>Alcala</u> stated, "Prior to an indictment, whether the issues will even overlap is a mere 'matter of speculation.' . . .  Accordingly, courts generally decline to impose a stay where a defendant is under criminal investigation, but has yet to be indicted. . . . Indeed, a 'pre-indictment motion to stay can be denied on this ground alone."[25] <u>Id.</u> at 401 (citations omitted); <u>see also</u> <u>A.S. Templeton Group</u>, 297 F. Supp. 2d at 534-35 ("Furthermore, Defendants have not been indicted or subpoenaed by a grand jury at this time.  Pre-indictment requests for a stay of civil proceedings are generally denied."); <u>Comptroller of the Currency v. Lance</u>, 632 F. Supp. 437, 442 (N.D. Ga. 1986) ("the possibility of a criminal proceeding cannot justify a stay").

---

[25]The court noted that, even after indictment, "courts are generally split as to the propriety of granting a stay."  625 F. Supp. 2d at 401 (citations omitted); <u>and see</u> <u>Incendy</u>, 936 F. Supp. at 954-57 (denying stay of civil trial, although the defendant was indicted, because he failed to present evidence of "direct and imminent harm to [his] Fifth Amendment rights").

Defendants were not indicted at the time of their depositions. In fact, the indictment against Defendants was not returned until September 15, 2009 [Doc. 1], approximately one year after the conclusion of the civil proceedings against CSHC and Defendant Harris on September 17, 2008 (Gov't Ex. 4; 1:06-CV-2568-CC, Doc. 47). In light of the recognized importance, as illustrated by District Judge Cooper's granting of the TRO and expedited discovery, of the civil litigation, these facts - even if any party had sought a stay in December 2006 or January 2007 - would have likely resulted in denial of that request. The Government was not required to seek a stay, and Defendants have not demonstrated the likelihood of success if a stay had been sought.

 **c.** **Conclusion**

 For these reasons, the court **RECOMMENDS** that Defendants' motions [Docs. 68, 74, 85] to suppress civil deposition testimony be **DENIED**.

## IV. Conclusion

 For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant Horton's motion [Doc. 75] for severance of Defendants be **DENIED**; that Defendants Harris', Stanley's and Horton's motions [Docs. 69, 88, 89] to dismiss Counts One, Two and Eight be **DENIED**; and that Defendants Harris', Stanley's and

Horton's motions [Docs. 68, 74, 85] to suppress civil deposition testimony be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**SO RECOMMENDED AND ORDERED** this 22nd day of October, 2010.

_____
JANET F. KING
UNITED STATES MAGISTRATE JUDGE

52